·RINK ET AL. V. SAMPLE ET AL..

1. **Contract**: FOR SALE OF LAND: EVIDENCE CONSIDERED. Evidence considered and held sufficient to establish a verbal contract between the defendant and one since deceased, in pursuance of which the latter transferred possession of certain land to the defendant, in consideration of his support during the remainder of his natural life.

*Appeal from Lee District Court.*

SATURDAY, APRIL 23.

ACTION for the partition of 43 acres of land in Lee county. The land, at one time, belonged to one Wiley Clay, who died intestate, in June, 1872. The action is brought by Daniel, Samuel H., and Adaline Rink, who claim to be heirs of Clay and each the owner of 1-27 undivided part of the land. Twenty-one other persons, alleged to be heirs, are joined as defendants under the general designation of "Heirs of Elizabeth Harris," "Heirs of John Clay," and "Heirs of Jacob Clay," the names of such heirs not being given nor yet alleged to be unknown. The persons named as heirs, whether as plaintiffs or defendants, aver that Wiley Clay died siezed of the land. The defendant George Sample denies this averment, and avers that he is the owner of the land by the purchase thereof from Clay. There was a decree for the defendant, Sample. The other defendants and the plaintiffs appeal.

*Casey & Casey*, for plaintiffs, appellants.

*Semple & Powell*, for defendants, appellants.

*Van Valkenburg & Hamilton* and *Craig & Collier*, for appellees.

ADAMS, CH. J.—It is not claimed by the appellee that he ever received from Wiley Clay a conveyance of the land. His title, so far as the same was derived directly from Clay,

was, if he had any title, an equitable one, and accrued by reason of a parol agreement, entered into between the appellee and Clay, whereby the appellee was to support and take care of Clay from the time of such agreement during the remainder of Clay's life, and have as compensation therefor all of Clay's property. Whether such an agreement was made constitutes the principal question in the case. In proof of it the appellee adduced the testimony of his wife and two sons. In disproof of it the appellants adduced no direct evidence, but they insist that the appellee's witnesses are not to be believed.

The testimony of one of the sons is by no means satisfactory. What he heard and distinctly remembered would hardly evince a completed contract. But, throwing this out, there still remains the testimony of the wife and the other son. And, while both were related and both testified to a transaction which occurred several years before, and while the son was but a boy, we are not prepared to say that they are to be wholly discredited. As a circumstance tending to show that they are, the appellants rely upon a fact which remains to be stated. After the death of Clay the appellee took counsel in regard to his title and was advised to procure a quit-claim deed from the heirs. He did procure a quit-claim deed which he supposed at the time was executed by all the heirs, and paid therefor the sum of $350. The appellants insist this fact shows that the appellee did not rely upon the alleged agreement.

It must be remembered, however, that the appellee had at best but an equitable title, and the circumstances were such that even that was liable to be disputed, as in fact it is. We think, therefore, that the appellee's expenditure of $350, in an attempt to quiet the numerous heirs, has little if any tendency to show that the alleged agreement was not made.

Another circumstance relied upon by the appellants is that soon after Clay's death the appellee asked one or two of his neighbors to measure or estimate the corn derived from the

Clay estate. This, it is said, shows that the appellee did not, at that time, claim to own it under the alleged agreement.

To our mind, it would, at most, only show an apprehension that the agreement might not be sustained.

The appellee's witnesses testified that Clay delivered to him the key of his house. Upon cross-examination it was made to appear very uncertain whether they saw such delivery.

In our opinion, the fact of delivery was not important. If the alleged agreement was made it must be sustained. It is undisputed that if made it was fully executed on the part of the appellee.

Of course, if the witnesses testified to something as a matter of knowledge upon their part, when it was only an inference or conjecture, it would have some tendency to impair their general credibility. But the circumstance is not one, we think, which would justify us in concluding that their credibility is wholly destroyed.

Some other circumstances are relied upon by the appellants which we do not deem it necessary to discuss. They are of a slight character and fail to convince us, whether taken singly or together, that the unrebutted testimony of the defendant's witnesses should be discarded.

There is much, indeed, to corroborate the witnesses and make probable the fact of the agreement. It is shown by undisputed evidence that Clay spoke, upon different occasions, of giving his property to the appellee in consideration of being supported by him. It is true at the time the agreement is alleged to have been made he was apparently approaching the end of his life. His property, above his debts, was worth from $1,200 to $1,500. It does not seem probable that it was supposed that the reasonable cost of his support and care would amount to that much. He lived, in fact, only about one week. He was sick, and we judge dangerously so, when the agreement is alleged to have been made, but it does not appear that he was without hope of recovery and a considerable extension of life.

Besides, it may properly be mentioned that the appellee's house had, for many years, been to Clay somewhat in the nature of a home. Clay never had a family. Some twenty-two years previous to his death he removed from North Carolina to Iowa with the appellee and his family, and from the time of such removal it appears that he and they were intimate friends. He found employment in different places, but to these friends he was accustomed to return in his leisure and especially in sickness. About two years before his death he attempted to establish an independent home. He bought, near to the appellee, the small farm in question and built upon it a small house or cabin. Still he did not live wholly independently. The apppellee's wife did his baking for him, and to some extent his washing. When the sickness came upon him, which proved to be the final one, he was removed, by his request, to the appellee's house. It was there that he died and from there that he was buried. His heirs, many of whom are made parties to this action, reside, so far as is known, in the State from which he removed. The evidence tends to show that his long separation from them had caused an estrangement. Some of the heirs were probably not known to him, even by name. Some, it appears, are not known even to the plaintiff and defendant heirs herein, nor have the exigencies of this action been sufficient to bring them to light.

Clay, on more than one occasion, expressed a desire that his property should not go to his heirs. We have no doubt that such remained his desire to the time of his death. He had this desire when he could have diverted the property by a will. He died intestate. We can but think that he died in reliance upon the agreement which it is alleged that he made with the appellee.

Having reached this conclusion, it is unnecessary to consider the validity of the quit-claim deed which he obtained from some of the heirs. In our opinion the judgment of the District Court should be

AFFIRMED.